The **RUSHTON COMPANY, a limited partnership, suing by Mary Phillips Rushton, its sole general partner,** Plaintiff,

v.

**F. W. WOOLWORTH CO., Bijou Toys, Inc., Dreamland Doll, Inc., Plastiplate Co., Inc. and Sam Richman, Defendants.**

United States District Court
S. D. New York.
Oct. 10, 1955.

---

6. Conference Report on the Immigration and Nationality Act of 1952, U.S.Code Cong. & Adm.News, 1952, Vol. 2, p. 1756.

Bondy & Schloss, New York City, Eugene L. Bondy, Bertram Braufman, New York City, of counsel, for plaintiff.

Schwartz & Frohlich, New York City, Arthur H. Schwartz, Lawrence C. Gibbs, New York City, of counsel, for defendants F. W. Woolworth Co. and Bijou Toys, Inc.

Morsch & Wieboldt, Jamaica, N. Y., Edwin G. Morsch, Jamaica, N. Y., of counsel, for defendant Dreamland Doll, Inc.

Skadden, Arps & Slate, New York City, Joseph H. Flom, New York City, of counsel, for defendant Sam Richman.

HERLANDS, District Judge.

This is a motion for a preliminary injunction to restrain the five defendants from allegedly infringing plaintiff's copyrighted chimpanzee doll, known as "Zippy."

The motion is denied as to Bijou Toys, Inc. and F. W. Woolworth Co. The motion is granted as to Sam Richman, Dreamland Doll, Inc. and Plastiplate Co. Inc. This disposition of the motion is predicated upon the findings and conclusions set forth in this opinion. Fed. Rules Civ.Proc. Rule 52(a), 28 U.S.C.

The complaint seeks a permanent injunction, an accounting, and related relief. Since the allegations in the complaint parallel those in plaintiff's motion papers, they will be considered together in determining the merits of plaintiff's application.

The complaint contains two causes of action under the Copyright Laws, U.S.C., Title 17. Sam Richman, Bijou Toys, Inc. and F. W. Woolworth Co. are named as defendants in the first cause of action. Dreamland Doll, Inc. and Plastiplate Co. Inc. are named as defendants in

the second cause of action. It is alleged that both causes of action present common issues of law and fact. The defendants are referred to in this opinion as "Richman," "Bijou," "Woolworth," "Dreamland" and "Plastiplate," respectively.

Plaintiff's Charges: In July 1953, plaintiff, Mary Phillips Rushton, conceived the idea of a chimpanzee doll entitled "Zippy." It was inspired by the live chimpanzee, Zippy, which has appeared on the television program known as "Howdy Doody." The first sketch was made in September 1953. The first shipment of the complete doll occurred on March 8, 1954. On or about May 10, 1954, plaintiff filed an application of a claim to copyright. Plaintiff received a certificate of registration dated and identified as "May 10, 1954, Class G, No. GP 6320." Plaintiff has a license to use the name "Zippy" or "Zip" and the title "Howdy Doody" in connection with its toy. She assigned all of her rights to Zippy to plaintiff-partnership, of which she is the sole owner. The individual plaintiff and the plaintiff-partnership will be referred to herein as the "plaintiff."

Every copy of Zippy has had a notice impressed upon the shoes of the figure reading: "Copyright The Rushton Co." On the lower tab of the face, under the chin, are the letters and words: "(C) The Rushton Co."

Since March 8, 1954, plaintiff has manufactured, published and marked its Zippy in conformity with the copyright statute. The Court of Appeals for the Second Circuit has adjudged the copyright to be valid. Rushton v. Vitale, 2 Cir., 1955, 218 F.2d 434.

The certificate of registration contains the following description of Zippy:

"A little chimp, exact reproduction of 'Howdy Doody's pal 'Zippy.' Made of combination of black shaggy rayon plush and vinyl parts. Impish handpainted vinyl face, hands, ears and shoes. Costumed in bright red velveteen overalls and tee shirt."

Notwithstanding this somewhat elaborate description, the parties have agreed that, for purposes of this litigation, Zippy's face is the essential feature that is the subject of the alleged infringement by copying. Plaintiff's charge of "unfair competition" is identical with the charge of "infringement." Thus, the factual dispute resolves itself into the question: Have the defendants copied Zippy's face?

In the first cause of action, the complaint joins Richman, Bijou and Woolworth as defendants. The charge is made that Richman, subsequent to May 10, 1954, manufactured and sold large quantities of a doll that contained several of the copyrighted component parts of Zippy; that Richman, subsequent to May 10, 1954, sold and distributed the infringing parts and figures to Bijou; that Bijou then incorporated in dolls manufactured by it (and sold under the name "Mambo") the substantial portions of plaintiff's copyrighted doll; that Bijou, subsequent to May 10, 1954, sold its Mambo doll in large quantities to Woolworth, who in turn sold large quantities of that toy to the public through its retail stores.

These statements in the complaint—that Richman has supplied Bijou with large quantities of infringing dolls or doll parts—are alleged upon information and belief; and they are repeated in plaintiff's moving affidavit. Such facts are said by plaintiff to have been "learned" from "investigations" conducted by plaintiff. However, the sources of plaintiff's information and the basis for her belief are not set forth.

Plaintiff charges that "the essential parts" of Zippy "are identical" with those used in Mambo and with the toy parts manufactured or sold by defendants; and that there is no difference between Zippy and Mambo, either in shape, dimension or measurement of any facial features. Plaintiff asserts that the offending dolls and parts were made either from molds procured from plaintiff's mold makers or from new molds constructed with genuine parts of plaintiff's toy used as a core. Plaintiff further

claims that some of the characteristic marks, such as mold numbers, were copied from plaintiff's original figure. In other words, it is charged that defendants "copied" plaintiff's copyrighted Zippy, and that that fact can be ascertained by mere visual inspection, as well as by the other proof contained in plaintiff's affidavits.

To support its claims against Bijou and Woolworth, plaintiff has submitted two chimpanzee dolls. One—marked Exhibit "D"—is Zippy, plaintiff's doll. The other—marked Exhibit "E"—is Mambo, a doll of defendant Bijou. An expert witness (Dr. Bruins), whose affidavit is presented by plaintiff, has examined and measured both Zippy and Mambo. According to this witness, there is an irregularity of the surface at a point under the chin on Mambo; and, at the corresponding point under the chin on Zippy, there is a "C." This witness claims that there has been an attempt by Bijou to obliterate plaintiff's marking "(C)" under the chin on the Mambo doll (Exhibit E); and that this is evidence of copying. Furthermore, this witness compares and lists various measurements of facial features on both Zippy and Mambo. For example, the total vertical length of the face as measured from the bottom of the chin to the center top of the forehead is longer in Mambo (4$\frac{9}{32}$ inches) than in Zippy (3$\frac{24}{32}$ inches). The width of the mouth, measured between the corners of the mouth, is less in Mambo (2$\frac{5}{32}$ inches) than in Zip (2$\frac{13}{32}$ inches). However, plaintiff's expert says that these variations are due to a distortion or stretching out of Mambo's flexible face in a vertical direction, resulting from the method of sewing and stuffing Mambo. Plaintiff's expert cites the following asymmetrical nostril-lip measurements: the measurement from the right nostril to the right corner of the lip is longer both in Zippy's face (1$\frac{17}{32}$ inches) and in Mambo's face (1$\frac{17}{32}$ inches) than the measurement from the left nostril to the left corner of the lip, both in Zippy's face (1$\frac{14}{32}$ inches)

and in Mambo's face (1$\frac{15}{32}$ inches). Plaintiff's witness is of the opinion that Mambo's face (Exhibit E) was copied from Zippy's (Exhibit D). He states that such copying may be done by making a plaster or wax impression of Zippy's face, then slightly remodeling the impression to alter some details and following this by the use of such altered duplicates in the preparation of molds, from which Mambo's face would be made.

A plastic chimpanzee face (Exhibit F), purchased from Richman, is virtually identical with the plastic chimpanzee face (Exhibit G) of Zippy. The measurements submitted by plaintiff's expert witness demonstrate that identity to the thirty-second of an inch.

The second cause of action of the complaint is confined to defendants Dreamland and Plastiplate. The complaint charges that, subsequent to May 10, 1954, Plastiplate manufactured molds from which Zippy's face was being produced; that Plastiplate sold those molds to Dreamland, who used them to manufacture plastic faces and other doll parts that were essentially the same as Zippy's; and that such faces and parts were sold by Dreamland to toy manufacturers who assembled them into dolls that were copies of, and thereby infringed upon, plaintiff's Zippy.

Plaintiff's moving affidavit also refers to Plastiplate and to Dreamland. Conspicuously absent is any statement that Plastiplate and Dreamland have connection or relationship with any of the other defendants, specifically Bijou or Woolworth.

It is clear, upon a factual analysis of the motion papers, that the acts of Bijou and Woolworth must be considered together; and that the acts attributed to Richman, Dreamland and Plastiplate must be considered separately and apart from those of Bijou and Woolworth. The evidence concerning Bijou's and Woolworth's alleged acts of infringement and Bijou's and Woolworth's explanations is entirely different from the evidence bearing upon the three other defendants.

The Case as to Bijou and Woolworth: At the outset, it must be noted that, so far as concerns Bijou and Woolworth, the complaint and plaintiff's original moving papers deal exclusively with a Bijou chimpanzee doll called Mambo, marked plaintiff's Exhibit "E." This exhibit is called "the offending article." There is no dispute that Bijou has sold to Woolworth dolls of which Exhibit "E" is a sample. There can be no serious dispute about the fact that the Mambo marked Exhibit "E" bears a strikingly close resemblance to plaintiff's Zippy.

What has happened is that *another* Mambo doll—a Mambo doll *different* from Exhibit "E" and not referred to in the complaint nor in plaintiff's original motion papers—has been brought into the case by Bijou in its answering affidavits. This *other* Mambo doll is Bijou's Exhibit "1" and is called "No. 1 Mambo" by Bijou. It is to be distinguished from plaintiff's Exhibit "E," which Bijou calls "No. 2 Mambo."

The circumstances and the sequence of the birth of No. 1 Mambo (Bijou's Exhibit 1) and No. 2 Mambo (Plaintiff's Exhibit E) go to the heart of plaintiff's case against Bijou and Woolworth.

According to Bijou, the Mambo toy (No. 2 Mambo) offered by plaintiff as Exhibit "E," and as "the offending article," is a doll which has not been manufactured or sold by Bijou for about six months. Bijou claims that it is currently making and selling only No. 1 Mambo dolls. To this, plaintiff anwers that both No. 1 Mambo (Exhibit 1) and No. 2 Mambo (Exhibit E) are infringing copies of Zippy (Exhibit D). Bijou denies any infringement by either Mambo doll.

Bijou's Answer to the Charge that No. 2 Mambo (Exhibit E) Is a Copy of Zippy (Exhibit D): Bijou alleges that it has been in the toy business for approximately twenty years; that it enjoys a fine reputation; that it has never before been involved in an infringement suit; and that it has sold millions of stuffed dolls and toys of its own manufacture.

Bijou claims that the measurements of plaintiff's own expert demonstrate "a substantial dissimilarity" between Zippy (Exhibit D) and No. 2 Mambo (Exhibit E). Thus, according to Bijou, "of Dr. Bruins' 9 points of measurement, he has been able to find only 2 points of similar measurement" in Zippy and No. 2 Mambo; and there are "more dissimilarities" than similarities. Bijou denies that the dissimilarities are due to distortions caused by vertical stretching of the face.

Bijou also places in evidence a page from a toy jobber's catalogue (Exhibit 14) which shows Zippy and Mambo, together with various other monkey dolls. Bijou argues that this exhibit proves that the toy jobber must have recognized "that there was enough of a dissimilarity between the Zippy and Mambo dolls to warrant placing them on the same catalogue page at substantial price differences."

We shall consider Bijou's explanations with respect to No. 2 Mambo in greater detail further in this opinion.

Bijou's Answer to the Charge That No. 1 Mambo (Exhibit 1) Is a Copy of Zippy (Exhibit D): As already noted, plaintiff's original motion papers do not refer to No. 1 Mambo (Exhibit 1). The reply affidavit of Dr. Bruins, plaintiff's expert, admits that the differences between Zippy and No. 1 Mambo "cannot be attributed to uneven stuffing" and that No. 1 Mambo is "the product of a separate sculpture" and "is a fresh sculpture." However, he states that the two dolls "bear striking resemblances," and that in his opinion the makers of No. 1 Mambo copied Zippy.

A close inspection discloses that the face of No. 1 Mambo is different from Zippy's. While Bijou lists what it calls fifteen "obvious dissimilarities," we regard the following as significant: No. 1 Mambo's face is larger; its cheek bone area is higher; the distance from its nose to the tip of the upper lip is longer; the expanse of its lips from end to end is larger; the shape of its mouth opening is different; the curvature of the upper lip is different; and, viewed sideways,

the contours and profile of the face are different.

Bijou explains away whatever similarities there may be between Zippy's and Mambo's faces by saying that "it is not unexpected" inasmuch as the sculptors who created Zippy and Mambo had "the same source of materials": live chimpanzees, photographs of chimpanzees, and both Zippy and another chimpanzee ("J. Fred Muggs") on television.

Moreover, the caliper measurements made by Russell F. Peterson, mammalogist with The American Museum of Natural History, clearly show, in ten respects, "a definite variation" in the facial measurements of Zippy and No. 1 Mambo.

Of controlling importance is Bijou's story of how it created its No. 1 Mambo—independently, in good faith, and without copying Zippy. On or about December 21, 1954, a molder of vinyl plastic parts (Mar-Ral Plastics, Inc.) submitted to Bijou sample sets of "monkey faces, ears, hands and shoes." These sets were designated as "Mambo Monkey" sets. Bijou points to this for the purpose of showing how and when Bijou first became interested in the idea of manufacturing a monkey doll. Thereafter, Bijou made contact with another molder or supplier or vinyl plastic toy parts, Geneve Manufacturing Corp. Geneve submitted samples of monkey parts similar to Mar-Ral's but at a lower price. For various practical reasons detailed in its answering affidavit, Bijou found the Mar-Ral and Geneve samples unsatisfactory.

Thereafter, "during the early part of January" 1955, a conference was held at Bijou's office. This was attended by a representative of Geneve (a Mr. Greenspun), representatives of Bijou (a Mr. Tannenbaum and a Mr. Belser), and a sculptor who had done work for Bijou in the past, one Antonio De Filippo.

At this conference, De Filippo was commissioned "to create a monkey face that would have a cute and pleasant expression with eye appeal. * * * the mouth and lips pursed in such a way as to indicate that the monkey was in the act of kissing. * * * to use his own creative ability and fashion something which he thought was really cute and had lots of eye appeal." In addition, various directions and information were given to De Filippo: to sculpt a "neuter" ear; the size of the ears; the face and ears to be appropriate for a toy of 20″ to 21″ in height; and to render his bill to Geneve.

On January 31, 1955, De Filippo rendered his bill to Geneve in the amount of $150. The bill states: "model chimpanze [sic] cast finished in wax." Bijou cites this bill as "evidence for the purpose of showing that defendant Bijou retained a sculptor to create an original monkey doll for it." Bijou flatly asserts that De Filippo "was not shown any monkey parts by us [Bijou] but was told to use his own creative ability."

Within about a week, De Filippo met with Tannenbaum, Belser and Greenspun and submitted a finished clay model that was completely satisfactory to them. Tannenbaum instructed De Filippo to cast the model in wax and to deliver a wax model to Bowers Molds, a firm well-known in the toy trade as a master mold caster. This was done during the middle of January 1955.

Within about a week, Bijou received the master mold from Bowers. This mold supplied a face that was too large for Bijou's fabric pattern. (This over-large original vinyl skin is Exhibit "3.") Bowers furnished Bijou with sets of molds for shoes, hands, ears and faces; and its bill therefor is dated January 31, 1955 (Exhibit 4). Because the original vinyl skin was over-large, the skin was trimmed down (in the manner shown on Exhibit "15"). From this trimmed down skin, production molds were made.

The copper mask from which Exhibit "15" was made is placed in evidence (as Exhibit 15a) by Bijou, to show "the effort and expense put in by Bijou to effect its originally created No. 1 Mambo monkey."

Bijou claims that the over-large original vinyl skin (Exhibit 3) produced from a mold based on De Filippo's model

is proof positive "that there can be no question that De Filippo created the original monkey parts for Bijou, as evidenced by the fact that his creation required change [trimming down] before it was able to be put to use by Bijou." The trimmed down skin (Exhibit 15), according to Bijou, "evidences the thought and expense to which Bijou went in order to effect an original monkey face suitable for its purpose."

Bowers' bill to Bijou, dated January 31, 1955 (Exhibit 4) proves, according to Bijou, that De Filippo had furnished Bijou the wax mold of its No. 1 Mambo prior to January 31, 1955, because the bill which is for finished molds is dated January 31, 1955.

Bijou's answering affidavit with respect to the creation of No. 1 Mambo is corroborated by the original and supplemental answering affidavits of De Filippo, the sculptor. De Filippo has been a practicing sculptor for forty years. He is listed in "Who's Who in the East." He has sculptured or rendered sculptural services on many statues, monuments and busts. He is familiar with "monkey sculpturing," having made a head, bust and a minature statuette of the television personality J. Fred Muggs some two years ago (Exhibits 16A–16H and Exhibit 17). He is familiar with "caricatures of members of the animal kingdom." He performed sculptural services for Bijou in the past.

De Filippo's affidavits describe the call to a conference during the first or second week of January 1955; the conference with Tannenbaum, Belser and Greenspun (of Geneve Manufacturing Corporation); and the instructions he was given. He confirms Tannenbaum's story that he was told to create a monkey face that would have "a cute and pleasant

expression with eye appeal," perhaps showing "the mouth and lips pursed in such a way as to indicate that the monkey was in the act of kissing." He was not shown any monkey sample, but was told to use his "own ingenuity in creating the desired parts." De Filippo further asserts: " * * * unequivocally that at no time prior to the institution of this action did I see a copy of plaintiff's 'Zippy' monkey doll."

After having been commissioned by Bijou, De Filippo did the following research as a preliminary to making a clay model: he visited the Bronx Zoo and spent an afternoon watching the chimpanzees and the monkey collection; he watched the famous television chimpanzees, J. Fred Muggs and Zippy; and he looked at photographs of chimpanzees in various books and magazines.* He then sculptured a clay model of a "cute chimpanzee face and ears" and showed it to Tannenbaum and Belser (of Bijou) and Greenspun (of Geneve). They approved it. Thereupon, he cast the model in wax and delivered the wax mold to Bowers Molds. The foregoing events transpired during the middle of January 1955. His bill for $150. (Exhibit 1A) was paid by Geneve.

De Filippo claims that the face and ears that he created for Bijou are his "own wholly original conception"; and that they were "originally created by me [De Filippo] without any access whatsoever to plaintiff's monkey doll."

Bijou's Explanation of the Genesis of No. 2 Mambo: Bijou asserts that No. 2 Mambo "has not been manufactured by defendant for some time, nor is it presently being manufactured or sold by defendant." The original manufacture of No. 2 Mambo occurred in the following manner:

---

* Bijou has placed in evidence a number of books and photographs for the purpose of demonstrating that—contrary to plaintiff's contention (Plaintiff's Memorandum of Law, p. 10)—a gaping mouth and lolling tongue is one of the natural expressions of a chimpanzee and is not plaintiff's "original conception" (Exhibits 8–13 [A–I] inc.).

This contention of Bijou is further buttressed by the affidavit of Russell F. Peterson (pp. 2–3), a representative of the Department of Mammals, The American Museum of Natural History, who is a qualified expert on "mammal-like representations" (Affidavit of Hobart M. Van Deusen, Department of Mammals, The American Museum of Natural History).

On or about February 2, 1955, Geneve began to manufacture for Bijou faces and ears molded "from the De Filippo mold." Hands and shoes were made from molds which Geneve "had in stock." Bijou ordered additional production molds from Bowers and they were eventually delivered to Geneve. (Exhibits "5" and "6" are Bower's bills dated March 26 and March 31, 1955, respectively.) However, during the period from February 23 to March 28, 1955, certain acts were committed by Geneve—acts that (according to Geneve and Bijou) are responsible for the ensuing complications and trouble. The additional production molds that Bijou had ordered from Bowers in February 1955, were not immediately forthcoming. Geneve and Bijou had to wait until Bowers completed these additional production molds for the No. 1 Mambo which were based on the De Filippo wax model.

To fill the resulting gap (until Bowers completed the ordered production molds), Geneve proceeded to use other molds of its own, which molds it had originally utilized in making the samples submitted to Bijou before De Filippo was commissioned. With these other molds, Geneve manufactured parts and shipped them to Bijou. No copyright or other notice appeared on any of these parts manufactured by Geneve. Eighty-four dozen sets of parts were made by Geneve from its own mold in this manner; and they were shipped to Bijou. It was this lot of eighty-four dozen sets of parts that Bijou then assembled and manufactured into the No. 2 Mambo (Exhibit E).

Production and delivery of the eighty-four dozen sets of parts resulting in No. 2 Mambo (Exhibit E) took place concurrently with the production and delivery of faces from De Filippo's mold, which was used in making No. 1 Mambo. This continued during a period of twenty-four production days. When the additional production molds that had been ordered from Bowers were delivered to Geneve, Geneve stopped using its own mold. Since that date, March 28, 1955, Geneve has not manufactured for or shipped to Bijou parts made by its own mold.

The eighty-four dozen sets of parts resulting in No. 2 Mambo, constitute (according to Bijou) "but a drop in the bucket so far as our [Bijou's] total production"—"many thousands"—of these toys is concerned. However, some of the No. 2 Mambo toys—made from the above-described eighty-four dozen sets of parts—were sold by Bijou to Woolworth. It is such toys, exemplified by Exhibit "E," that precipitated the preliminary injunction motion now before this Court.

Discontinuance of Bijou's Manufacture and Sale of No. 2 Mambo Dolls: Bijou asserts that its factory no longer makes or possesses a single No. 2 Mambo; that since March 28, 1955, it has been manufacturing No. 1 Mambo dolls, solely and exclusively; and that since the early part of April 1955, only No. 1 Mambos have been shipped to Woolworth.

Plaintiff challenges Bijou's statement and points to the fact that as recently as August 20, 1955, three No. 2 Mambo dolls (like Exhibit "E") were purchased from two Woolworth stores—one store located at Wantagh, Long Island; the other located at Levittown, Long Island. Bijou's reply is that these three No. 2 Mambo dolls are part of the original eighty-four dozen No. 2 Mambo dolls that were commingled with the No. 1 Mambo dolls.

Other Elements in Controversy as to Evidence of Copying: Bijou denies that any of plaintiff's mold numbers are to be found on its products. An inspection of the exhibits supports Bijou's contention in this respect.

Bijou also denies that there is any rough spot on the throat, under the chin of No. 2 Mambo, where plaintiff charges that there is an erasure of plaintiff's copyright notice. An inspection of Bijou's product fails to disclose any reliable evidence to support plaintiff's charge. An encircled "c" does appear on the ears of No. 2 Mambo. An encircled "c" on the ear, and the words "Bijou Toys" and an encircled "c" on the

neck, appear on No. 1 Mambo. Bijou claims that these markings on No. 1 Mambo constitute its own copyright notice, although it has failed to file its registration in the Copyright Office "in the press of things." It is intimated that Bijou may have been trying to "scare off" competitors by these markings.

Consideration of Rushton v. Vitale: In Rushton v. Vitale, 2 Cir., 1955, 218 F. 2d 434, the Court of Appeals for the Second Circuit, reversing the District Court, granted a preliminary injunction to plaintiff, where the defendants in that case reproduced Zippy even to the extent of copying plaintiff's mold number and copyright notice. The Court of Appeals concluded that infringement was "indisputable, since the visual resemblance between the two dolls is apparent", 218 F.2d at page 436, and the defendants' doll is "substantially identical to, and was obviously copied from, that of plaintiff". 218 F.2d at page 435. In that case, proof that "defendants' copy could in any case have been derived only from the [plaintiff's] three-dimensional figure itself" consisted of the following evidentiary facts: "the reproduction of plaintiffs' mold number" on defendants' dolls and the reproduction of "plaintiffs' copyright notice, on defendants' dolls". 218 F.2d at page 436.

■ Bijou requests this Court to disregard the decision of the Court of Appeals for the Second Circuit in Rushton v. Vitale and to determine *de novo* whether plaintiff's copyright on Zippy is valid. For purposes of this motion, this Court regards Rushton v. Vitale—which held, 218 F.2d at page 435, that "there seems little doubt as to the validity of plaintiffs' copyright"—as dispositive of that specific legal issue.

Bijou also argues that this motion presents the following "serious and weighty" legal questions: whether a doll's head, as a head, is copyrightable material; whether a doll is copyrightable; and whether a "work of art" comes within the purview of the word "writings" as to which Congress is granted the power, Constitution, Article I, Section 8,

to enact copyright legislation. In addition, Bijou claims that, by virtue of the Copyright Act, Sections 5(g) and 19, and the absence of copyright markings on a small monkey doll said to have been manufactured by plaintiff (Exhibit 18), plaintiff has lost its copyright protection. These and other points of copyright law that any of the defendants desire to raise can be better adjudicated in the light of the fuller record and cross-examination to be had on a plenary trial.

Findings and Conclusions as to Bijou and Woolworth: The inescapable inference from all of the evidence contained in the affidavits and exhibits is that Bijou's No. 2 Mambo (Exhibit E) was copied from Zippy (Exhibit D). The copying, however, was not done by Bijou or Woolworth. The mold used by Geneve during the twenty-four day production period in February and March 1955, must have been obtained by Geneve from one of plaintiff's moldmakers or modelled by or for Geneve after Zippy's face. Just how Geneve came into possession of that particular mold is not explained. Geneve has not been made a party to this litigation.

■ Bijou's No. 1 Mambo (Exhibit 1) is not copied from Zippy. This finding is based upon a visual examination, the inference to be drawn from Bijou's and De Filippo's explanation of the creation of No. 1 Mambo, and the comparison made by Mr. Peterson, the mammalogist of The American Museum of Natural History. In any event, that evidence is sufficiently substantial as to present a genuine and vital conflict of proof that can be resolved only upon a full trial.

The evidence requires the following findings:

that Bijou innocently commingled eighty-four dozen of the offending No. 2 Mambo dolls with the non-offending No. 1 Mambo dolls during a production period of twenty-four days during the months of February and March 1955;

that Bijou manufactured many thousands of the Mambo dolls, and the offending No. 2 Mambo dolls represented "a

drop in the bucket" in relation to Bijou's total production of Mambo dolls;

that the infringing No. 2 Mambo dolls have been out of production for approximately the past six months; and

that Bijou has not sold any such infringing dolls to Woolworth for approximately the past six months.

The foregoing findings are not materially affected by the fact that plaintiff apparently has succeeded in purchasing, on August 20, 1955, in the suburban area, only three of the offending dolls: two from the Woolworth store at Wantagh, Long Island, and one from the Woolworth store at Levittown, Long Island. It is likely that they were part of the original eighty-four dozen remaining on the shelves, and not freshly manufactured. The Mambo doll purchased by plaintiff at the Barracini store in Hempstead, Long Island, on August 20, 1955, is a non-offending No. 1 Mambo doll.

The sale of No. 2 Mambo dolls, which constituted infringement, has virtually ceased for a period of about six months. There is little likelihood that such sale will recur.

■ Where, as here, there is no reasonable ground for believing that there will be a repetition of the infringement, the Court will not grant an injunction. That result is strongly suggested where, as here, the granting of an interlocutory injunction would inflict damages upon Bijou and Woolworth out of proportion to the benefit that would inure to plaintiff. Sheldon v. Moredall Realty Corporation, 2 Cir., 1938, 95 F.2d 48; Smith v. Wilkinson, 1 Cir., 1938, 97 F.2d 506; Vitaphone Corporation v. Hutchinson Amusement Co., D.C.D.Mass.1937, 19 F. Supp. 359.

Plaintiff, apparently, has waited since April 1955 to commence this action. Moreover, plaintiff has suggested that this motion be adjourned to an unspecified further date in order to take the depositions of four of Bijou's key witnesses (Tannenbaum, Belser, De Filippo and Greenspun) if the Court should desire the testimony of such witnesses for use upon this motion. That plaintiff's attorneys recognize the existence of factual issues which can be better determined on the basis of oral testimony, is clearly indicated by one of plaintiff's attorneys, who states in his supplemental affidavit (p. 4):

"But if the Court has the slightest doubt that Mr. De Fillippo had access to the plaintiff's copyrighted doll after reading the affidavits of Sam Richman to the effect that that doll was widely popular and scattered in great quantities throughout the country, the plaintiff would ask that the hearing of this motion be adjourned to a further date to permit the taking of depositions of Messrs. Tannenbaum, De Fillippo, Belser and Greenspun to aid the Court in coming to a decision."

This suggestion is tantamount to the somewhat paradoxical proposition that this motion for a preliminary injunction should be adjourned until after there has been virtually a plenary hearing.

The Case as to Dreamland: Dreamland has consented to a temporary injunction but "reserves the right to continue its defense to this action in all other respects" (Dreamland's Memorandum, p. 2). The motion for a preliminary injunction, therefore, is granted against Dreamland Doll, Inc., subject to the said reservation.

■ The Case as to Plastiplate: Plastiplate was duly served with the motion papers but has not appeared upon the argument nor submitted an opposing affidavit or memorandum. The Court has before it only Plastiplate's answer to the complaint. The answer consists of denials of plaintiff's material allegations and three affirmative defenses.

In view of the charges contained in plaintiff's moving affidavit, the motion for a preliminary injunction is granted against Plastiplate Co., Inc.

■ The Case as to Richman: Richman's answering affidavit and his attorney's supplementary affidavit allege that Richman never manufactured the plaintiff's copyrighted parts and that he never sold for his own account quantities of

such parts as claimed by plaintiff; that Richman is "a sales agent for such faces and decorator of these faces." Richman does, however, admit decorating certain plastic faces of a chimpanzee that are the exact likeness of Zippy's face. (See Exhibits F and G.) He claims (1) that he acted as a salesman for a principal—not named by him—in selling "less than 7500" faces after he decorated them; and (2) that he has ceased decorating and selling such faces. Richman's answering papers are unconvincing, for they are lacking in factual detail to explain away his clear infringement. His generalized statements do not make out a defense. Plaintiff has demonstrated that irreparable harm would result from the failure to grant this motion as to Richman. Plaintiff has made enough of a showing to warrant the issuance of a temporary injunction against Richman; and the motion, accordingly, is granted in that respect.

The motion is denied as to Bijou and Woolworth. The motion is granted as to Richman, Dreamland and Plastiplate. Settle order on notice.

This disposition of the motion is without prejudice to an application for a preference on the trial calendar.

